# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## BIG STONE GAP DIVISION

| | |
|---|---|
| **JEFFREY L. CARTER,**  Plaintiff | ) ) ) |
| v. | ) Civil Action No. 2:09cv00064 ) **REPORT AND** ) **RECOMMENDATION** |
| **MICHAEL J. ASTRUE**, **Commissioner of Social Security,** Defendant | ) ) By: PAMELA MEADE SARGENT ) United States Magistrate Judge |

*I. Background and Standard of Review*

Plaintiff, Jeffrey L. Carter, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), determining that he was not eligible for disability insurance benefits, ("DIB"), and supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. §§ 423, 1381 *et seq.* (West 2003 & Supp. 2010). Jurisdiction of this court is pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more

than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Carter protectively filed his applications for DIB and SSI on August 16, 2006, alleging disability as of April 15, 2005, due to back, neck and leg problems, nervousness and depression. (Record, ("R."), at 74-76, 79-83, 91, 120, 136.) The claims were denied initially and on reconsideration. (R. at 43-46, 48, 50-52, 54-57, 59-60.) Carter then requested a hearing before an administrative law judge, ("ALJ"). (R. at 61.) The hearing was held on April 11, 2008, at which Carter was represented by counsel. (R. at 20-38.)

By decision dated May 1, 2008, the ALJ denied Carter's claims. (R. at 11-19.) The ALJ found that Carter met the nondisability insured status requirements of the Act for DIB purposes through June 30, 2007. (R. at 13.) The ALJ also found that Carter had not engaged in substantial gainful activity since April 15, 2005, the alleged onset date. (R. at 13.) The ALJ determined that the medical evidence established that Carter suffered from severe impairments, namely a back disorder and a borderline range of intellectual abilities, but he found that Carter did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 13, 15.) The ALJ found that Carter had the residual functional capacity to perform simple, unskilled, light work[1] limited by an inability

---

[1]Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If an individual can do light work, he also

to lift or work overhead and to perform repetitive or continuous gripping, grasping or the use of foot controls. (R. at 16.) The ALJ found that Carter was unable to perform any of his past relevant work. (R. at 18.) Based on Carter's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that a significant number of other jobs existed in the national economy that Carter could perform, including jobs as a cleaner, a bagger, a flagman, a counter clerk, a food cashier, a parking lot attendant, a host and a greeter. (R. at 18-19.) Thus, the ALJ found that Carter was not under a disability as defined under the Act and was not eligible for benefits. (R. at 19.) *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (2009).

After the ALJ issued his decision, Carter pursued his administrative appeals, (R. at 7), but the Appeals Council denied his request for review. (R. at 1-5.) Carter then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481 (2009). The case is before this court on Carter's motion for summary judgment filed March 9, 2010, and the Commissioner's motion for summary judgment filed April 12, 2010.

## *II. Facts*

Carter was born in 1976, (R. at 74, 79), which classifies him as a "younger person" under 20 C.F.R. §§ 404.1563(c), 416.963(c). He completed the tenth grade and has past work experience as a masonry helper and a factory worker. (R. at 26, 30-31, 92, 95.)

Cathy Sanders, a vocational expert, also was present and testified at Carter's

---

can do sedentary work. *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (2009).

hearing. (R. at 34-36.) Sanders classified Carter's work as a factory worker and a masonry helper as heavy[2] and unskilled. (R. at 34.) Sanders was asked to consider a hypothetical individual of Carter's age, education and past work experience, who was limited to simple, unskilled, light work that did not require him to lift or work overhead and that did not require repetitive or continuous gripping, grasping or use of foot controls. (R. at 34-35.) Sanders identified jobs that existed in significant numbers in the national and regional economy that such an individual could perform, including jobs as a flagger, a counter clerk, a food cashier, a parking lot attendant, a host and a greeter. (R. at 35.) Sanders was asked to consider the same individual, but who was unable to work in environments that would expose him to excessive dust, fumes, chemicals and temperature extremes. (R. at 35.) She stated that the jobs as a parking lot attendant and a flagger would be eliminated. (R. at 35.) Sanders stated that there would be no jobs available for an individual whose ability to concentrate and persist at work tasks was compromised as a result of frequent pain. (R. at 35.) When asked about the same individual, but who could occasionally[3] reach, handle or finger, Sanders stated that the individual could perform the jobs of a counter clerk, a food checker, a host, a greeter and a flagger. (R. at 36.) Sanders testified that an individual limited to reaching, handling and fingering on a less than occasional basis could perform the jobs of a host, a greeter and a flagger. (R. at 36.) Finally, Sanders testified that an individual who had to lie down for as much as two hours per day could not perform any of the enumerated jobs. (R. at 36.)

---

[2]Heavy work involves lifting objects weighing up to 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. If someone can do heavy work, he also can do medium, light and sedentary work. *See* 20 C.F.R. §§ 404.1567(d), 416.967(d) (2009).

[3]"Occasionally" was defined to the vocational expert as "less than one-third of the day." (R. at 36.)

In rendering his decision, the ALJ reviewed records from the Tennessee Department of Rehabilitation Services; Wellmont Holston Valley Medical Center; Dr. Gregory Corradino, M.D.; Katherine E. Turner, F.N.P., a family nurse practitioner; Dr. James B. Millis, M.D., a state agency physician; Dr. William Humphries, M.D.; Dr. Richard Surrusco, M.D., a state agency physician; Kimberly S. Scalf, M.A., a school psychologist; and Kingsport City Schools. Carter's counsel submitted additional medical records from Cornerstone Health Group to the Appeals Council.[4]

On December 19, 1990, Carter was referred for a psychological reevaluation.[5] (R. at 282-87.) Kimberly S. Scalf, M.A., a school psychologist, evaluated Carter. (R. at 287.) The Wechsler Intelligence Scale for Children-Revised, ("WISC-R"), test was administered, and Carter obtained a verbal IQ score of 73, a performance IQ score of 73 and a full-scale IQ score of 71. (R. at 282.) Scalf reported that Carter's IQ scores were possibly an underestimate of his true level of intellectual functioning. (R. at 284.) In 1987, Carter obtained a verbal IQ score of 87, a performance IQ score of 96 and a full-scale IQ score of 91. (R. at 283.) Scalf reported that, based on her observations, the results of the then-current evaluation did not indicate that Carter met the criteria for continued identification as a learning disabled student. (R. at 286.)

The record shows that Carter was seen at the emergency room at Holston Valley

---

[4]Since the Appeals Council considered this evidence in reaching its decision not to grant review, (R. at 1-5), this court also should consider this evidence in determining whether substantial evidence supports the ALJ's findings. *See Wilkins v. Sec'y of Dep't of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991).

[5]The prior evaluation is not contained in the record.

Medical Center on 25 different occasions between October 2004 and September 2006[6] for various complaints, including toothaches, headaches, a left wrist injury, right elbow and knee pain, an injury to his right index finger, left shoulder, back and neck pain, left hand pain and right leg pain. (R. at 153-86.) On December 22, 2004, an MRI of Carter's cervical spine showed a small to medium broad-based posterior C6-7 disc protrusion with moderate central canal stenosis and mild ventral cord compression, a small shallow C5-6 disc protrusion on the left with mild canal stenosis without cord compression and mild anular disc bulges at the C3-4 and C4-5 disc spaces. (R. at 232-33, 239-40.) On January 25, 2005, a CT scan of Carter's cervical spine showed narrowing of the cervical spinal canal and a small central protrusion at the C6-7 disc space with very slight ventral cord. (R. at 236.)

On July 22, 2005, Carter presented to the emergency room with complaints of left shoulder, upper back and neck pain following a motor vehicle accident. (R. at 166-67.) He stated that he was able to drive to work, but that he could not work due to increased pain. (R. at 166.) X-rays of Carter's cervical spine and left shoulder were normal. (R. at 166.) On August 13, 2005, Carter complained of right hand pain resulting from a work injury. (R. at 165.) An x-ray of Carter's right hand was normal. (R. at 165.) On October 14, 2005, Carter complained of right knee pain. (R. at 162.) He denied an injury, but reported that he pushed wheelbarrows at work. (R. at 162.) An MRI of Carter's right knee showed a small amount of knee joint effusion and a

---

[6]The record shows that Carter was seen on three occasions in 2004, October 29; November 22; and December 28. (R. at 153-55.) He was seen on 14 occasions in 2005, January 15; January 25; March 15; June 27; June 28; July 22; August 13; August 18; September 12; October 14; November 8; December 8; December 18; and December 26. (R. at 156-77.) Carter was seen on eight occasions in 2006, January 2; February 15; April 4; May 5; July 25; August 10; August 11; and September 11. (R. at 178-86.)

probable small lymph node. (R. at 234-35, 237-38.) On December 8, 2005, Carter complained of right arm pain after working with heavy sand and block. (R. at 160.) He was diagnosed with tendinitis of the right elbow. (R. at 160.) On April 4, 2006, Carter complained of low back pain after carrying a television out of his house. (R. at 184.) He was diagnosed with back strain. (R. at 184.)

On August 11, 2006, Carter presented to the emergency room with complaints of low back pain after carrying a couch. (R. at 180-81.) He was diagnosed with acute lumbar spine strain with sciatica. (R. at 181.) On September 11, 2006, Carter complained of back pain after lifting a tool box. (R. at 179.) He was diagnosed with chronic back pain. (R. at 179.)

On February 16, 2005, Carter saw Dr. Gregory Corradino, M.D., for complaints of neck and low back pain. (R. at 195-97.) Carter had normal motor strength in all major muscle groups in both upper and lower extremities. (R. at 196.) Sensation was diminished to pinprick in the left fourth and fifth digits. (R. at 196.) Carter had normal range of motion of the cervical spine. (R. at 196.) No spasms or tenderness was noted. (R. at 196.) Straight leg raising tests were negative. (R. at 196.) Carter ambulated without a limp. (R. at 196.) Dr. Corradino reviewed Carter's cervical CT scan dated January 25, 2005, and opined that Carter had a small disc bulge at the C6-7 disc space and chronic neck and back pain. (R. at 196-97.) Conservative treatment was recommended. (R. at 197.) Carter next saw Dr. Corradino on September 7, 2006, with complaints of low back and leg pain. (R. at 192-94.) Carter had full strength in both his upper and lower extremities. (R. at 193.) A CT scan of Carter's lumbar spine showed a broad-based disc extrusion at the L5-S1 level and evidence of S1 nerve root

compression. (R. at 199.) Dr. Corradino diagnosed herniated nucleus pulposus at the L5-S1 level with nerve root compression and low back and bilateral lower extremity pain. (R. at 193.) On October 16, 2006, Carter underwent a hemilaminotomy and diskectomy at the L5-S1 level on the left. (R. at 189.) On November 8, 2006, Carter complained of upper extremity numbness. (R. at 252.) A cervical myelogram showed cervical stenosis. (R. at 252.) On January 10, 2007, it was noted that Carter did not attend physical therapy as recommended. (R. at 251.) Straight leg raising tests were negative and Carter had a normal gait. (R. at 251.) Dr. Corradino reiterated the importance of attending physical therapy.[7] (R. at 251.)

The record shows that Carter saw Katherine E. Turner, F.N.P., a family nurse practitioner with the Virginia Center for Integrated Medicine, from February 2006 through May 2008 for various complaints, including cervicalgia, lumbago, leg cramps, diplipidemia, hypertension, toothaches and knee pain. (R. at 210-31, 266-80, 289-305, 321-25.) In May 2006, Carter complained of right shoulder and neck pain after lifting a heavy box from his truck. (R. at 219.) In August 2006, an MRI of Carter's lumbar spine showed left posterior disc extrusion at the L5-S1 level with focal left S1 nerve root compression. (R. at 229.) In October 2006, Turner noted that she had a discussion with Carter concerning his pain medications. (R. at 212.) She reported that Carter was obtaining medications from two different doctors and that Dr. Corradino refused to prescribe medication for Carter. (R. at 212.) Beginning in February 2007 through April 2008, Carter reported that his medications were working well. (R. at 267-68, 292-93, 301-02, 323.) He reported that he continued to have occasional pain, but that it resolved quickly. (R. at 301.)

---

[7]There is nothing in the record to indicate that Carter participated in physical therapy.

On December 4, 2006, Dr. James B. Millis, M.D., a state agency physician, reported that Carter had the residual functional capacity to perform medium[8] work. (R. at 241-48.) No postural, manipulative, visual, communicative or environmental limitations were noted. (R. at 243-45.)

On January 8, 2007, Susan Schelton, an examiner for the Tennessee Department of Rehabilitation Services, completed a Vocational Analysis Worksheet indicating that Carter had the residual functional capacity to perform medium work. (R. at 112-14.) No postural, manipulative, visual, communicative or environmental limitations were noted. (R. at 112.) Nonetheless, Schelton reported that Carter would not be expected to make a satisfactory adjustment to other work. (R. at 114.)

On September 18, 2007, Dr. William Humphries, M.D., examined Carter at the request of Disability Determination Services. (R. at 254-58.) Carter had slightly reduced neck range of motion. (R. at 255.) His back range of motion was moderately reduced without significant kyphosis. (R. at 255.) He had no scoliosis or muscle spasm. (R. at 255.) Carter's joint range of motion in his upper extremities was slightly reduced in both shoulders, within normal limits in both elbows, wrists and hands without significant tenderness, heat, swelling or deformity. (R. at 256.) He had reduced range of motion in both hips. (R. at 256.) Dr. Humphries diagnosed degenerative disc disease of the lumbar spine, chronic cervical strain with degenerative disc disease, mild degenerative joint disease of both hands and feet and possible early mild chronic obstructive pulmonary disease. (R. at 257.) Dr. Humphries

---

[8]Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds. If an individual can do medium work, he also can do sedentary and light work. *See* 20 C.F.R. §§ 404.1567(c), 416.967(c) (2009).

reported that Carter had the residual functional capacity to perform medium work. (R. at 257.) He reported that Carter could occasionally climb, kneel, crawl, stoop and crouch. (R. at 257.) Dr. Humphries reported that Carter could rarely perform overhead work and that he could not perform repetitive or continuous gripping, grasping or operation of foot controls and should avoid fumes. (R. at 257.)

On September 26, 2007, Dr. Richard Surrusco, M.D., a state agency physician, reported that Carter had the residual functional capacity to perform medium work with a limited ability to push and/or pull with his lower extremities. (R. at 259-65.) He reported that Carter could occasionally climb, balance, stoop, kneel, crouch and crawl. (R. at 261.) Dr. Surrusco reported that Carter's ability to reach overhead was limited. (R. at 261.) No visual or communicative limitations were noted. (R. at 261-62.) Dr. Surrusco indicated that Carter should avoid concentrated exposure to temperature extremes, wetness and fumes, odors, dusts, gases and poor ventilation. (R. at 262.)

*III. Analysis*

The Commissioner uses a five-step process in evaluating SSI and DIB claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2009); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920. If the Commissioner finds conclusively that a claimant is or is not disabled at any point

in this process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a) (2009).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B) (West 2003 & Supp. 2010); *see also McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

By decision dated May 1, 2008, the ALJ denied Carter's claims. (R. at 11-19.) The ALJ determined that the medical evidence established that Carter suffered from severe impairments, namely a back disorder and a borderline range of intellectual abilities, but he found that Carter did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 13, 15.) The ALJ found that Carter had the residual functional capacity to perform simple, unskilled, light work limited by an inability to lift or work overhead and to perform repetitive or continuous gripping, grasping or the use of foot controls. (R. at 16.) The ALJ found that Carter was unable to perform any of his past relevant work. (R. at 18.) Based on Carter's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that a

significant number of other jobs existed in the national economy that Carter could perform, including jobs as a cleaner, a bagger, a flagman, a counter clerk, a food cashier, a parking lot attendant, a host and a greeter. (R. at 18-19.) Thus, the ALJ found that Carter was not under a disability as defined under the Act and was not eligible for benefits. (R. at 19.) *See* 20 C.F.R. §§ 404.1520(g), 416.920(g).

Carter argues that the ALJ's determination of his residual functional capacity is not supported by substantial evidence. (Plaintiff's Brief In Support Of Motion For Summary Judgment, ("Plaintiff's Brief"), at 7-8.) Carter argues that the ALJ erred by failing to address all of the medical opinions of record. (Plaintiff's Brief at 8.) Carter argues that the ALJ failed to discuss the limitations posed by Dr. Humphries and the state agency physician, Dr. Surrusco, in his decision. (Plaintiff's Brief at 8-11.) He also argues that the ALJ erred by failing to order a consultative exam to determine the effects of his mental impairments on his work-related abilities. (Plaintiff's Brief at 11-14.)

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. The court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays*, 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. §§ 404.1527(d), 416.927(d), if he sufficiently explains his rationale and if the record supports his findings.

Carter argues that the ALJ's determination of his residual functional capacity is not supported by substantial evidence. He argues that the ALJ erred by failing to address the postural and environmental limitations posed by Dr. Humphries and Dr. Surrusco. (Plaintiff's Brief at 8-11.) The ALJ found that Carter had the residual functional capacity to perform simple, unskilled, light work limited by an inability to lift or work overhead and to perform repetitive or continuous gripping, grasping or the use of foot controls. (R. at 16.)

Carter's alleged date of disability is April 15, 2005. (R. at 74, 79.) However, the record shows that, through December 2005, Carter was seen at the emergency room complaining of work-related injuries or pain. (R. at 160, 162, 165.) In addition, the record shows that Carter was treated for back pain after carrying a television and couch and lifting a tool box. (R. at 179-81, 184.) In October 2006, Carter underwent a hemilaminotomy and discectomy at the L5-S1 level on the left. (R. at 189.) Carter did well following surgery. (R. at 252.) One month after surgery, Carter reported that

he was not taking pain medication. (R. at 252.) On examination, his deep tendon reflexes, gait and strength were normal. (R. at 252.) Dr. Corradino prescribed physical therapy, but the record does not indicate that Carter ever participated in physical therapy. (R. at 251-52.) The record shows that Carter received only conservative and routine medical treatment. (R. at 266-80, 289-305.) Progress notes indicate that Carter's medications were working well and that he was doing okay. (R. at 267-68, 273, 276-77.) "If a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986).

In September 2007, Dr. Humphries opined that Carter had the residual functional capacity to perform medium work. (R. at 257.) He further found that Carter could occasionally climb, kneel, crawl, stoop and crouch. (R. at 257.) Dr. Humphries also found that Carter should avoid fumes. (R. at 257.) In addition, the state agency physicians, Drs. Millis and Surrusco, both opined that Carter had the residual functional capacity to perform medium work. (R. at 241-48, 259-65.) While Dr. Millis did not place any additional limitations on Carter's work-related abilities, Dr. Surrusco found that Carter could occasionally climb, balance, kneel, crawl, stoop and crouch and that his ability to reach overhead was limited. (R. at 261.) Dr. Surrusco also found that Carter should avoid concentrated exposure to temperature extremes, wetness and fumes, odors, dusts, gases and poor ventilation. (R. at 262.)

Social Security Ruling 85-15 states that stooping, kneeling, crouching and crawling are progressively more strenuous forms of bending parts of the body. *See* S.S.R. 85-15, WEST'S SOCIAL SECURITY REPORTING SERVICE, Rulings 1983-1991 (West 1992). Social Security Ruling 83-14 states that most light jobs require no

crouching and only occasional stooping. *See* S.S.R. 83-14, WEST'S SOCIAL SECURITY REPORTING SERVICE, Rulings 1983-1991 (West 1992). Similarly, Social Security Ruling 85-15 notes that some stooping, which is defined as bending the body downward and forward by bending the spine at the waist, is required to do almost any kind of work. *See* S.S.R. 85-15, WEST'S SOCIAL SECURITY REPORTING SERVICE, Rulings 1983-1991. If a person can stoop occasionally, which is defined as from very little up to one-third of the time, the sedentary and light occupational base is virtually intact. *See* S.S.R. 85-15, WEST'S SOCIAL SECURITY REPORTING SERVICE, Rulings 1983-1991. This also is true for crouching, which is defined as bending the body downward and forward by bending both the legs and spine. *See* S.S.R. 85-15, WEST'S SOCIAL SECURITY REPORTING SERVICE, Rulings 1983-1991. Crawling on hands and knees and feet is a relatively rare activity even in arduous work, and limitations on the ability to crawl would be of little significance in the broad world of work. *See* S.S.R. 85-15, WEST'S SOCIAL SECURITY REPORTING SERVICE, Rulings 1983-1991. This also is true of kneeling, which is defined as bending the legs at the knees to come to rest on one or both knees. *See* S.S.R. 85-15, WEST'S SOCIAL SECURITY REPORTING SERVICE, Rulings 1983-1991.

Here, the jobs previously enumerated by the vocational expert all were at the light level of exertion. (R. at 35.) That being said, it is clear that the ALJ's restricting Carter to the performance of light work took into account the postural limitations identified by Dr. Humphries and Dr. Surrusco. Furthermore, the ALJ included in his hypothetical to the vocational expert the environmental limitations indicated by Drs. Surrusco and Humphries. (R. at 35.) The vocational expert testified that there would be jobs available that such an individual could perform within these limitations. (R.

at 35.)

Carter also argues that the ALJ erred by failing to order a consultative examination to determine the effects of his mental impairments on his work-related abilities. (Plaintiff's Brief at 11-14.) The ALJ accounted for Carter's borderline intellectual functioning by limiting him to simple, unskilled work. (R. at 16.) Under 20 C.F.R. §§ 404.1519a(b), 416.919a(b), an ALJ is not required to obtain a consultative examination, and such examination may be purchased when the evidence is not sufficient to support a decision on the claim. Based on my review of the record, I find that a consultative examination was not necessary.

The record shows that a face-to-face interview indicated that Carter had no difficulty with reading, understanding, coherency, concentrating, writing, talking or answering questions. (R. at 88.) In 1990, the WISC-R was administered, and Carter obtained a verbal IQ score of 73, a performance IQ score of 73 and a full-scale IQ score of 71. (R. at 282.) The evaluator reported that, based on her observations, Carter did not met the criteria of a learning disabled student. (R. at 286.) In addition, Carter's borderline intellectual functioning did not preclude him from working in the past. (R. at 104.) Furthermore, the record does not document any treatment for depression or anxiety, nor does it indicate that Carter complained of such symptoms. Thus, the evidence does not demonstrate that Carter's mental impairments precluded him from performing simple, unskilled work.

For all of these reasons, I find that substantial evidence does exist in the record to support the ALJ's residual functional capacity finding.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1. Substantial evidence exists to support the Commissioner's finding with regard to Carter's residual functional capacity; and

2. Substantial evidence exists to support the Commissioner's finding that Carter was not disabled under the Act and was not entitled to DIB or SSI benefits.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny Carter's motion for summary judgment, grant the Commissioner's motion for summary judgment and affirm the final decision of the Commissioner denying benefits.

## **Notice to Parties**

Notice is hereby given to the parties of the provisions of 28 U.S.C.A. § 636(b)(1)(C) (West 2006 & Supp. 2010):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations

to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED: July 22, 2010.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE